Thank you, Your Honor. May it please the Court, this is a very unusual case, and I think there are. I think you want to introduce yourself for the record. Excuse me. I'm Mark Burton on behalf of Mr. Silverstein, the plaintiff, appellant. So are you in place of Mr. Walton? That's correct. Okay. Go ahead, Mr. Ruebert. What we have here is a classic case of spam, and there was some fundamental confusion by the lower court about who was involved and what exactly the law requires. Unlike many of the other cases, this is a case that does not just involve impairment of the identity of the sender. This is what Kilbride talked about in terms of complete obstruction. Still to this day, the identity of the sender is unknown. So when the trial – the fundamental mistake that was made by the trial court was looking at where the message was sent through. It's the equivalent of a spammer sending through a fake Gmail account, spam out, and then saying, well, you know where it came from. It came from Gmail. So I guess the question – the question I'd like you to focus on is how difficult would it have been to ascertain the identity of the sender? What kind of investigation would the recipient have to undertake in order to determine that information, if it's determinable at all? Well, that's the thing, Your Honor. I mean, potentially it could – it very well could be impossible in this particular case. Maybe through some forensics using LinkedIn's servers and trying to track down through very sophisticated means. Sometimes law enforcement can do it if they have access to that sort of information. But it would take an enormous amount of tracking actual computer IDs. So LinkedIn wouldn't be able to tell the recipient who the sender was? Likely not. Likely they may be able to try to track down an IP address that this came from somewhere. But given the fact that this isn't a casual spam operation, these were many spams that were spent, this is probably a very sophisticated spammer who can cloak that identity potentially. Roberts. Roberts. Oh, sorry. Go right ahead. Yeah. I'm having trouble seeing why we should distinguish Gordon versus Virtu Mondo. That case says that to avoid preemption, you have to show that the header is materially false or materially misleading, not just that it's false in identifying the sender. And I don't really see why it's material. I mean, you can tell it's spam. You can tell it's commercial email, just like junk mail in your mailbox. It doesn't pretend to be from your best friend saying he's being held by kidnappers in some foreign place and needs $10,000. It doesn't say it's from your priest or minister or rabbi. I don't understand how you distinguish Gordon. Could you expand on that a little? Sure. The Can Spam Act defines in 7704 that when you have header information, and that includes false from information, that that is materially misleading. So the Can Spam Act itself defines it as material. So we're bound, you understand, by our previous interpretations of the act. That's why I asked about Gordon. I understand that. But in Gordon, you were able to determine from the who is look up easily who the identity of the actual sender was. So there was not an issue there. This was not a completely fake account that was made up and then concealed so that you could no longer track down who the actual identity of the sender was. Well, here, isn't the sender LinkedIn? No. It's spam that's sprayed to this group? No, Your Honor. What was actually what I'm — what I understand, it was actually sent from a LinkedIn participant. It was on their network. No. It was a false LinkedIn identity that was created, and it was sent through LinkedIn. It says on the front line, lianachristiangroupsnoreplyatlinkedin.com. Correct. So the fake was the lianachristian. There is no lianachristian. They sent it through LinkedIn, which is just like me creating a fake Gmail account and then sending it through Gmail. Google has not initiated. They are not the sender of the message. But it's not a fake Gmail if it's created. It actually came from — through the LinkedIn platform, right? Right. But LinkedIn is serving just like Gmail on this particular instance. What's wrong with just push and delete before you open it? Well, the whole point is that they're concealing their identity. You don't know necessarily that it's spam, number one. Number two — Except it's from an unknown person, and it says how to make a million dollars in a day or something. Well, number one, that could be legitimate email. But number two, the whole point of the Cannes Spam Act is to cut down on the proliferation of this type of information. And the other point of — that Congress specifically had in mind, by being able to know who the identity of the sender is, then you have an ability to contact the sender and prevent further communications. Here, you don't have that ability. You're going to keep getting bombarded with more and more spam, wasting more and more data, more and more time, more and more deletions. That's exactly what the attempt by Cannes Spam was to prevent. So is it — Oh, go ahead. Sorry. I don't think you got to my question about Gordon. How and why should we distinguish Gordon? Because in Gordon, the sender was identifiable easily, and there was no concealment In other words, they didn't just disappear, and you could never track them down. You could easily look them up. Oh, I see. You're saying the sender isn't LinkedIn. The sender is this nonexistent person, Linda something. It's somebody. We just don't know who it is exactly. LinkedIn did not — remember, the words are initiate. LinkedIn didn't initiate any of this. They're merely the service being used by somebody, like a Gmail or like anything else. Well, it's not like Gmail. I know that there's this rule that we judges are not supposed to join affinity groups, but we can use Gmail. So you're not going to find federal judges on LinkedIn, by and large, but you will find judges who use Gmail, and there's a difference because there's no affinity group. For example, oh, if you like developing film in your darkroom, there'll be a group, and you may get ads that are sprayed to the group from stores that sell darkroom chemicals. But if Gmail is just free email that everybody uses, and you don't have to have any kind of affinity with other users. That's correct, but LinkedIn is very similar. You don't have to necessarily have any affinity. You can falsely create something just like you can with Gmail. It isn't like these people know each other and then sign up together. These are completely unknown individuals that can just sign up for these interest groups within LinkedIn. It might be a different type of website service or mail service or communication service, but when you look at 7704A through C, it's no different. Somebody is using a computer to hide their identity, which is exactly what CAN-SPAM was attempting to prevent, and they're not only impairing, they're completely obstructing their identity. Whoever the sender is, is completely obstructed. And there is no way, especially what's been pled in the complaint, to actually determine who that sender was. And I don't think the defendants have ever even attempted to argue that there is a way to identify the actual sender. Alito, how did you come up with the names of the various dot-coms and then the two individuals and so on? Well, correct. So you have to keep in mind that in order to even we're talking about the CAN-SPAM Act here. In order to be spam, you have to have somebody that's identified. In other words, spam is commercial email where somebody is attempting to either promote a pornography site primarily or some other service or product. And so spam, by definition, always contains somewhere where you can click and it's going to take you somewhere where you can identify someone. But I thought our decision in Gordon sort of took a holistic approach in analyzing the sender and that we approved looking at sort of the email as a whole, including the sender, the subject line, and perhaps even the body of the message that it contains in asking the question, how difficult would it be to determine the sender? So how did you do it? I mean, you've obviously named all these entities as defendants in the lawsuit. Well, that's the confusing part. We never identified the sender. The advertisers, the people actually selling the book being advertised under California law are strictly liable for the message being sent. So that's why they're sued, okay? You can always find out who the spam is meant to promote, okay? By looking at the text of the message. Or hitting the link and going to, you know, leading to where the actual product is being sold. Okay. Okay, but you still have not identified the sender. But if you contact those advertisers and say, please take me off the email distribution list, that's not going to do the point of doing that. Absolutely not. These are, you know, multitudes of senders creating fake accounts all over the world. And they have they could care less if the advertiser or anyone else tried to communicate with them. They're pushing out millions of spam. They are not going to slow down their pace for anything. If you can look at the subject line and find out who the sender was, who the advertiser is. Oh, no. Remember, hand spam requires that the actual sender who initiated the email, you have to be able to identify them. And that's the key here. You can always identify the advertiser in spam. Okay? And if the standard was, if you can identify the advertiser, then you can't sue. Well, then there would be no such thing that Can't Spam Act would be completely eviscerated. It looks to me as though the purpose might well be served. Suppose you infer a purpose from the construction of the statute to keep away spam that's going to cheat people. For example, I imagine all of us get spam now and then that says something's gone wrong with your PayPal account or with your Visa or something like that. Click on the link and you can fix it. And then you click on the link and the first thing it wants is your password and maybe your bank account number. And that's dangerous spam. If anyone's misled by it, they're going to get cleaned out. On the other hand, there's spam that's just like junk mail in your mailbox. That's what this spam appears to be. Junk mail. Send us $25 or I don't know what it was for some book or pamphlet and we'll tell you how to get rich. I can see a real difference in the harm that Congress was trying to prevent. Obviously, it meant to prevent the first kind of harm where the spam misleads you into giving up information that's harmful to you. And not the second kind of harm precisely because it's just like junk mail in your mailbox. Why shouldn't the statute be read that way and why shouldn't Gordon be read as saying the statute should be read that way? Well, I think the very title of the act reveals Congress's intent. You think Congress's intent is to keep all junk mail out of your mailbox? No, it's not to keep all junk mail out of your email box, but it's to cut down on it. If you go to the Congressional findings and policy and look at it, it's the controlling the assault of non-solicited pornography and marketing. It's not controlling the assault of fraudulent emails or controlling the assault of fraud. It's controlling the assault of non-solicited pornography and marketing, which is exactly what we have in this case. And if you look at the Congressional findings and policy that are stated in 7701, it goes through extensive findings about electronic mail has become an extremely important and popular means of communication. The convenience and efficiency of electronic mail. The receipt of unsolicited commercial electronic mail may result in costs to recipients who cannot refuse to accept such mail and who incur cost for the storage of such mail over the time of or for the time spent accessing, reviewing, and discarding such mail. That reveals clear Congressional intent. You're saying that's in the statutory findings, not the legislative history? That's actual part of the statute. That's 7701 I'm reading from. So. Can you tell me if you know if Mr. Silverstein had to go to his junk mail to find these? I don't believe so. I don't believe that it went. I can't tell you for certain. I can't tell you for certain, but I don't know that that would matter. But I believe because he does use LinkedIn, it went directly to him. But you don't know. Your time has expired. I apologize. I'm going to reserve some rebuttal time. I'll give you a little time on rebuttal. May it please the Court, my name is Tyler Newby, and I represent the Applebee's Kinetics, Inc., and Click Sales, Inc. The flip side of the question I ask your adversary, why shouldn't we distinguish Gordon in light of the statutory findings? So our position is that the district court got it right, that Gordon. I know that, but I'm wondering why we shouldn't distinguish Gordon. So what Gordon and Judge Talman, I think, addressed this in his questions to counsel is that we understand Gordon took a holistic view of what the e-mail, what is in the e-mail, not just the from name, not just the domain name in the sender, not just the subject matter, but everything about the e-mail. And is there anything about that e-mail, in looking at the e-mail in its entirety, that is materially false, that is, tending to mislead or actually misleading? He says that what's materially false is it says it's from Linda Christian, and it isn't. The e-mail itself was sent by LinkedIn. The district court correctly found that the LinkedIn, LinkedIn, the company, sent this e-mail. But the statutory word your adversary points out is initiate. That word does not appear. There's no Linda Christians. I'm sorry? And there is no Linda Christiansen. So she can't be the initiator. And if LinkedIn didn't do it deliberately, but was in essence just a pass-through platform, then it seems that under the statute, somewhere out there in the world is the true originator of this e-mail message. How do we find out who that is? Well, there are multiple different ways. And... Well, if I hit who is and I ask about Linda Christiansen, that's not going to help me. That's correct. If I ask who is LinkedIn, I can find that out, but that's a dead end because LinkedIn wasn't the one who actually ginned up this e-mail message. So it is important that you can do a who is search and find that it's LinkedIn. Yeah, but a computer search of what? That's what I'm wrestling with here. What is it that I would look at in order to determine the true sender? So the true sender, there are multiple things you can do. One is you can complain to LinkedIn, and LinkedIn may provide the identity of the user. Secondly, here, you can click on the link in the e-mail. This is what the California Court of Appeal and Wagner, the AspireVision, if you can find out who the sender is, the true sender is, or the advertiser from following a link or looking at the body of the e-mail. But if I talk to LinkedIn, I'm the aggrieved plaintiff, and I contact LinkedIn, it seems to me at best LinkedIn is going to give me an IP address, maybe, after a forensic examination of the e-mail router history of this message. And then what do I do? So we don't know. It's not within the record of what LinkedIn would do. But Congress's purpose here was to ensure that people have a way of finding out how to contact the person responsible for sending so that they can ask not to. But the complaint alleges that there is no way to do that, and reading the allegations as presumed to be true, you haven't convinced me that that allegation is not a plausible allegation at this point. Well, I think the purpose of that, though, the reason why Congress was intended to carve out from preemption materially false or misleading was that there was some recourse for a recipient of an e-mail to take some action to complain that they did not receive e-mails like this again or stop it. But if I want to unsubscribe to this type of e-mail, who do I complain to? LinkedIn. And this is in the record. This is ER-91. It's a copy of the e-mail the plaintiff received. There are multiple ways in that e-mail body from LinkedIn that say, would you like to flag this e-mail as spam or inappropriate? Find out how to modify your LinkedIn settings so you don't receive e-mails like this anymore. But I thought that was the reason that the senders used multiple .com addresses so that if I block one .com address, then other .com addresses will step up and more junk e-mail will flow into my account. In Clefman v. Vonage Holdings, the Ninth Circuit certified a question to the California Supreme Court on whether the use of multiple domains that were truthful domains, just as LinkedIn.com here is a truthful domain, if that was deceptive or misleading. And the California Supreme Court said no. As long as that domain is traceable to an actual body or company, as LinkedIn.com is here, there's nothing materially misleading about the use of that domain. And that's... So you could then run a whois search on this .com entity and it would take you to Kinetics or Quicksales? I mean, it looked to me like there were multiple levels of LLCs and other corporate forms of organization that were obfuscating who was the true sender of this e-mail. And they used false names in the original sender line, the Linda Christensen's, to further aggravate the possibility of identifying the sender. Why isn't that different from what we had in Gordon? So it's, admittedly, these are different facts from what was in Gordon. We can see that. This is not an on-all-fours case. I guess the problem is, where do I draw the line? I mean, you know, we tried to articulate a workable rule in Gordon on that set of facts. But as you point out, these facts are different. Arguably, they're more egregious in terms of obfuscating the identity of the sender. So I guess the question is, have your clients stepped over the line in... So we would argue that they are not more egregious. There is a control in place here, and that is the fact that LinkedIn, which is a respectable company, was the company through which these e-mails were sent, through groups-noreply at LinkedIn.com. That is the way that the plaintiffs or other recipients of these types of e-mails can control the receipt of further e-mails. In order to complain to LinkedIn, wouldn't you have to know the identities of all of the various dot-coms that were employed by your clients? In other words, you could block... I don't know a lot about blocking e-mail messages. That's what the IT department does. But if I were to block one of these, don't I have to have the list of all 12 or 15 of them in order to effectively stop these messages from coming? Well, that would have been the case in Clefman v. Vonage as well. And the Supreme Court said, as long as it's a legitimate domain name, it's not materially misrepresenting who the sender is, even though the sender in that case allegedly used multiple domain names to avoid spam filters. Here there is a mechanism, this is in the record, ER-91 again, multiple ways that the user can click on one of these unsubscribe or stop e-mail buttons through the e-mails he receives through LinkedIn. That's the mechanism that Congress required through CanSpam. Was there an unsubscribe button on the original e-mail message that came through Linda Christensen? Yes, and this is in the record. There is a button that says, is this discussion inappropriate, abusive, offensive, spam, job, flag. There's a button there. And then there's another link that says, stop receiving e-mail for each new discussion. And so there are ways within the body of this e-mail that the user, things that the user can take to control the receipt of similar messages like this. But I assume that if that button was hit, it would only affect e-mails coming from that particular dot-com account, right? That, well, so now we're getting outside of the record here. Yeah, I appreciate that. And, but that, that would control how LinkedIn, which is the sender of this e-mail, would send e-mails to this user. Won't I just be, if I click on that button, won't I just be blocking Linda Christensen and I'll still get the junk mail from clickbait or whatever it's called from other fictional names? Your Honor, I'm sorry. This is outside of the record, so we don't, we don't know. Well, I guess the concern here is, have the plaintiffs shown enough so that this case ought to proceed on the theory that because of the manner in which the defendants have obfuscated the originator of the message, it, it could potentially be false and fraudulent under the California statute, which would be exempted from federal preemption, and therefore the case should go forward to discovery to answer some of these questions. Well, again, turning to what is, is there anything materially false that's alleged? And the only thing that the plaintiff has alleged is false is the front name. That's this Leanna Christensen. The plaintiff does not allege that the subject line is deceptive or misleading. We can see that if the subject line said something to the effect of, open this email to receive a $25 gift certificate, that could potentially be deceptive. There are cases like that that have been exempted. But that's not the case we have here. We have a truthful domain name. We have a, a from name that we would say is not really distinguishable from the fanciful names in cases like, like Gordon. So it's not materially false. It's not material. It's not, it does not tend to mislead or actually. Maybe false but not material. But the difference in Gordon was that he had, he was identified in some of those or entities that he controlled were, were identified in those domain names. Whereas here, the domain names are entirely fictitious. There is no Linda Christensen. Well, that's not the domain name. That's just a, that's just a from name. I'm sorry. That's the, the domain name is linkedin.com. Linkedin, yeah. And that is, that's truthful. There's no, that's not disputed. Yeah. And so the, the issue, as Judge Jack was saying, is, is this materially false? And in Gordon, when this Court was looking to what, what does false mean? What does deceptive mean? Does that mean an error? Does it mean just not true? And the Court said it has to be grounded in traditional tort theory, State law tort theory, and what, and that is tending to mislead or actually misleading. There's nothing in this e-mail that tends to mislead or actually misleads the recipient. And this is what the district court found. And, and the plaintiff conceded this at the court below. They didn't believe that, that there was anything in here that, that actually deceived them or tended to mislead them. This was not a name. Leanna Christensen was not a name. I'm sorry? The, the Silverstein did not know who that was. That's right. This was a, this was a totally insignificant name. It's not like in Huang v. Reunion, where the, the sender name appeared to be a person known to the recipient. I, I believe it was the, the recipient's minister. Or other cases where the, the actual recipient name, that the, the, the sender uses a program that puts the recipient's name in the sender name. So it's as if I were to receive an e-mail saying, Tyler Newby at Gmail just sent you an e-mail about this. Right. There's nothing that tends to mislead or is material or, or actually misleads about this e-mail. If I can turn to one other matter. The, the plaintiff did not address this in. You mean to mislead. You mean it doesn't mislead you about who Linda Christensen is or Leanna Christensen or whatever, because you don't care. And it doesn't mislead you about what they're selling because it's some sort of pamphlet or book that you can find by clicking on it. Is, is that what you mean? Yes, Your Honor. It, it, it does not tend to mislead who the identity or the, the recipient is not tricked into thinking that this is a person that they know and that therefore they should open this e-mail. It's patently commercial from the subject line, how a newbie banked $5,000 this week. This is not a name of any significance to this recipient. And the plaintiff conceded that, that he was not actually deceived. And there's nothing in here that tends to deceive. To, to turn back to Judge Tallman's question of how do we find out who these senders are or who the recipients are, when you click on the link, and, and these were the facts in the Wagner v. Spirevision case, when you click on the link, it takes you to a website. And that's who's selling a product. And, and that is another way that the sender or the person responsible for sending the e-mails can be identified and, in fact, was identified here. If the panel has no further questions. Anybody have anything else? Thank you. I think that, thank you very much, Mr. Burke. Thank you, Your Honor. All right. I'll give you a couple minutes on rebuttal, Mr. Burke. Isn't this the case where you use the Latin words, you don't put the word next to it? What's that? Isn't this the case where you use the Latin words, you put the word next to it? Yeah, yeah, yeah. I love that. Yeah. Very briefly, Your Honors, it has to be conceded here. There, these are burn accounts. In other words, this isn't like you can hit unsubscribe and unsubscribe from whoever that original initiator is, sender, from ever sending you anything again. If you were going to unsubscribe from all of LinkedIn, just like you can terminate Gmail, then you can't get the legitimate e-mail that you're trying to receive. So that's not a practical solution. And these accounts, you have to remember, are burned. So it wouldn't, it wouldn't just block if the recipient clicked on whatever was at the Linda Christensen, it wouldn't just block further e-mails from Linda Christensen. No, and you have to remember, I mean, there's dozens of e-mails that are alleged in the complaint here. They're not going, these spammers, this is completely fraudulent activity, they're not even going to use that Christensen address again. As soon as they've successfully sent one message out with that false identity, it's burned, create a new false one, send that. So. And create a new false name. That's right. I'm wondering, if you do block the account, does it block everything from the sellers.com, the seller site? No. I mean, I don't care, since the person checking his e-mail wouldn't know Linda Christian anyway, since she's not a real person. The most that they could care about is blocking any attempts from this particular company to send them e-mail, and I'm wondering if blocking the .com would do it on LinkedIn. It won't, ultimately, because you have to remember, these spammers out there are independent of the advertisers. The advertisers do have the ability to pay them, which is the whole reason why they're liable, but the spammers are just out there, they really don't have a care about responsibility or anything like that. They might be overseas, primarily. They're just cranking this stuff out as much as they can to try to make as much as they can from the advertiser. It's basically like a traditional company hiring a traditional junk mail sender to print up some junk mail and send it forth, whatever class of mail they use for junk mail. Isn't that right? Similar, except that the relationship isn't quite as direct. They have this ability to pay these people, but it's not like they specifically hire them up front and have conditions, okay, you're going to send exactly this many mailers, and we're going to pay you exactly this amount. They only get paid if somebody orders the product, right? They get some sort of a fee for that. Or potentially a click. Okay. Your time has expired. Thank you, Your Honor. Thank you very much. The case just argued is submitted. Thank you for the argument. We'll now hear argument in the case of DeSoto Cab Company versus Michael Picker, number 17-15261.
judges: Kleinfeld, Tallman, Jack